**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2938-17T3
                A-3099-17T3

DANIEL M. YABLONSKY,

     Plaintiff-Appellant,

v.

ENCOMPASS INSURANCE
COMPANY OF NEW JERSEY,
ANGELO LOBOSCO and
LOBOSCO INSURANCE GROUP,
LLC,

     Defendant-Respondents.

_____

DANIEL M. YABLONSKY,

     Plaintiff,

v.

ENCOMPASS INSURANCE
COMPANY OF NEW JERSEY,

     Defendant-Respondent,

and

ANGELO LOBOSCO and
LOBOSCO INSURANCE GROUP,
LLC,

       Defendants-Appellants.

_____

       Argued May 8, 2019 – Decided December 24, 2019

       Before Judges Alvarez, Nugent and Mawla.

       On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1974-14.

       Francis X. Garrity and Thomas D. Flinn argued the cause for appellant Daniel M. Yablonsky in A-2938-17 (Garrity Graham Murphy Garofalo & Flinn, attorneys; Francis X. Garrity and Thomas D. Flinn, of counsel; Jane G. Glass, on the briefs).

       Syed S. Ahmad (Hunton Andrews Kurth, LLP) of the District of Columbia and Virginia bars, admitted pro hac vice, argued the cause for appellants Angelo Lobosco and Lobosco Insurance Group in A-3099-17 and respondents Angelo Lobosco and Lobosco Insurance Company in A-2938-17 (Sullivan & Klein, LLP, and Syed S. Ahmad, attorneys; Frederick Miles Klein, Syed S. Ahmad, and Geoffrey B. Fehling (Hunton Andrews Kurth, LLP) of the District of Columbia and Pennsylvania bars, admitted pro hac vice, on the briefs).

       Richard J. Mirra argued the cause for respondent Encompass Insurance Company of New Jersey (Hoagland Longo Moran Dunst & Doukas, attorneys; Richard J. Mirra, of counsel and on the briefs).

The opinion of the court was delivered by

NUGENT, J.A.D.

These appeals, which we consolidate for this opinion, center around plaintiff Daniel M. Yablonsky's claim that his parents' automobile insurance policy should have included $1,000,000 in excess underinsured motorist (UIM) coverage on the date Daniel was injured in an accident involving a motor vehicle. In No. A-2938-17, Daniel appeals both the summary judgment dismissal of his claim that the trial court should have construed his parents' insurance policy to provide $1,000,000 excess UIM coverage and the involuntary dismissal at trial of his professional negligence claim against his parents' insurance producer for failing to inform them excess UIM coverage was available. In No. A-3099-17, Daniel's parents' insurance producer appeals the summary judgment dismissal of its contractual indemnification claim against the insurance company that issued the automobile insurance policy to Daniel's parents.

We must decide three issues on these two appeals. First, we must decide whether Daniel's parents' insurance policy should be construed to provide excess UIM coverage due to an alleged ambiguity in its coverage summary, even though Daniel's father, who purchased the policy, knew the policy did not include excess UIM coverage. Given the father's undisputed knowledge the

3

policy did not provide excess UIM coverage, we decline to construe the policy to provide it.

Next, we must decide whether the trial court erred by dismissing at the close of Daniel's proofs at trial his professional negligence claim against his father's insurance producer for failing to inform his parents of the availability of excess UIM coverage when such coverage became available.  We conclude Daniel established a prima facie case of professional negligence that should have been submitted to the jury.

Last, we must decide whether the trial court erred by dismissing on summary judgment the insurance producer's contractual indemnification claim against the company that issued the insurance policy to Daniel's parents.  We conclude the plain and unambiguous terms of the contractual indemnification clause preclude indemnification and the trial court did not err in so finding.

## I.  Background and Procedural History.

Daniel possessed a valid driver's license, but was riding a bicycle on May 13, 2012, when he was struck by a Jeep insured under a policy with $15,000 liability limits.  For purposes of this appeal only, there is no serious dispute that the compensable value of Daniel's injuries equals or exceeds $1,250,000. Daniel collected the tortfeasor's $15,000 liability limits.  He also collected the balance

of the $250,000 UIM limits he was entitled to collect under his parents' insurance policy, which covered Daniel and the vehicle he owned. His parents had purchased the policy, an Encompass Insurance Co. of NJ (Encompass) USP Elite-Package (Encompass Policy), through defendants Angelo Lobosco (Mr. Lobosco) and Lobosco Insurance Group, LLC (Lobosco Group). The Encompass Policy included motor vehicle, homeowners, fire, and personal umbrella coverage, but no UIM or uninsured (UM) umbrella coverage.

In May 2014, Daniel filed a three-count complaint against the Lobosco defendants and alleged causes of action for negligence, breach of contract, and breach of fiduciary duty. Daniel based his claims on these defendants' failure to inform his parents that excess UIM and UM coverage had become available. The following month, Daniel filed an amended four-count complaint.

The amended complaint's first count, which stated a cause of action against Encompass for breach of contract, alleged the Encompass Policy in effect when Daniel was struck by the Jeep included a coverage summary that suggested the policy included $1,000,000 of Personal Umbrella UIM coverage. Daniel sought a declaration that he was afforded $1,250,000 under the Encompass Policy. The remaining three counts, against the Lobosco defendants

5

but not Encompass, repeated the causes of action pled against the Lobosco defendants in the original complaint.

After Daniel filed his amended complaint, the Lobosco defendants filed an answer with affirmative defenses. Thereafter, they amended their answer and included, among other things, a cross-claim for contractual indemnification against Encompass.

Following discovery and some motion practice not relevant to this appeal, all the parties moved for summary judgment. The trial court denied Daniel's motion, granted Encompass's motion, and granted the Lobosco defendants' motion in part. The court dismissed Daniel's claims against the Lobosco defendants for breach of contract and breach of fiduciary duty but denied the Lobosco defendants' motion to dismiss the professional negligence claim. The court also denied the Lobosco defendants summary judgment on their contractual indemnification claim.

During the ensuing trial, following the close of Daniel's case, the Lobosco defendants moved for, and the court granted, an involuntary dismissal of Daniel's remaining claim. The court denied Daniel's motion for reconsideration. Daniel filed this appeal.

6

Following the trial, the Lobosco defendants renewed their summary judgment motion seeking contractual indemnification from Encompass. Encompass cross-moved for summary judgment. The trial court denied the Lobosco defendants' motion and granted Encompass's motion. The Lobosco defendants appealed from the ensuing order.

## II. The Motion and Trial Records.

For purposes of the summary judgment motions and the motion for involuntary dismissal at trial, the parties did not seriously dispute that the Jeep's driver caused the accident, Daniel was entitled to UIM coverage under his parents' Encompass Policy, and the compensable value of Daniel's injuries exceeded $250,000. Daniel and Encompass sharply disputed the clarity of the Encompass Policy, the Lobosco defendants denied any wrongful conduct, and Encompass disputed it was required to indemnify the Lobosco defendants under the terms of the indemnification provision of the Lobosco-Encompass agency agreement.

## A. The Encompass Policy.

The Encompass Policy, entitled "USP Elite-Package," renewed on December 19, 2011, expired on December 19, 2012, and was in effect when Daniel's accident occurred in May 2012. The policy included a nine-page

A-2938-17T3

"Renewal Policy Coverage Summary" (Coverage Summary) and 170 pages of terms and conditions. The Coverage Summary section entitled "Motor Vehicle Protection" identified four vehicles and provided an overview of the coverage for each, including the coverage limits and premiums. The parties do not dispute that each vehicle was insured for UM and UIM coverage with split limits of $250,000 per person, $500,000 per accident.

The Coverage Summary included a section entitled "Personal Umbrella Coverage," which stated:

> PERSONAL UMBRELLA COVERAGE (Coverage applies only if a premium or limit is shown)
>
> COVERAGES
> PERSONAL UMBRELLA COVERAGE: applies to all "covered exposures" and "additional covered exposures"

The Personal Umbrella Coverage Summary section showed coverage of $1,000,000 and specified the "Minimum Retained Limit" the insured was required to maintain in underlying insurance: a combined single limit of $500,000 each accident or a split basis limit of $250,000 bodily injury each person, $500,000 bodily injury each accident, and $100,000 property damage each accident. The Personal Umbrella Coverage Summary section also

specified the premium for the coverage. The terms "covered exposures" and "additional covered exposures" were undefined.

The Coverage Summary ended with a statement that the policy was subject to "the following forms and endorsements" and was followed by thirty-five forms and endorsements. The "Personal Umbrella Coverage Endorsement-New Jersey" expressly excluded UM and UIM benefits.

Representatives of Encompass and its parent company conceded during depositions that someone reading the Coverage Summary would also have to read the policy endorsements to understand that umbrella coverage was provided for liability, but not UM or UIM claims. In 2014, Encompass changed the Coverage Summary's Personal Umbrella Coverage section to read:

> THIS PERSONAL UMBRELLA SEGMENT DOES NOT PROVIDE COVERAGE FOR EXCESS UNINSURED OR UNDERINSURED MOTORIST COVERAGE EXCEPT FOR VEHICLES WHERE A LIMIT IS SHOWN FOR EXCESS UNINSURED OR UNDERINSURED MOTORISTS COVERAGE.

According to the representative of Encompass's parent company, the language was changed in 2014 to "reinforce" that there was no UM or UIM umbrella coverage.

When deposed, Daniel's father could not recall the year he first purchased the umbrella policy through the Lobosco Group but did remember that Mr.

Lobosco told him the policy did not provide UM or UIM coverage. Mr. Lobosco testified in his deposition that he did not remember such a conversation. He did remember that he procured an umbrella policy for Daniel's father in 1997.

### B.  Summary Judgment as to Daniel's Claims.

The trial court dismissed on summary judgment Daniel's claims against Encompass. The court also dismissed on summary judgment Daniel's breach of contract and breach of fiduciary duty claims, but not his professional negligence claim, against the Lobosco defendants. As to Encompass, the trial court found no ambiguity in the Encompass Policy and no inconsistency between the Encompass Policy's Coverage Summary and its insuring provisions. The court also found the Coverage Summary notified the insureds the personal umbrella coverage was subject to the restrictions, conditions, and exclusions found in the body of the policy and its endorsements. According to the trial court, nothing in the Coverage Summary would give the insured a reasonable expectation of excess UIM coverage. Moreover, Daniel's father, who purchased the policy through Mr. Lobosco, was aware from the policy's inception the policy contained no UIM coverage and thus had no reasonable expectation to the contrary.

A-2938-17T3

Daniel does not challenge on appeal the grant of partial summary judgment to the Lobosco defendants.

### C.  Trial and Dismissal of Daniel's Claims Against the Lobosco Defendants.

Daniel and the Lobosco defendants stipulated at trial that: Daniel sustained injuries in an accident caused by a negligent driver whose liability limits were $15,000, which the driver's insurer paid; Daniel was insured under his parents' Encompass Policy and Encompass paid the $250,000 UIM limits less the credit for the negligent driver's $15,000 liability limit; and Daniel's damages were sufficiently severe to support a recovery of $1,250,000.  Daniel testified about the accident and confirmed he had received the available liability and UIM insurance coverage.

Daniel's father testified he had obtained insurance through the Lobosco Group since 1986 or 1987.  After Daniel's father bought a home, Mr. Lobosco recommended he purchase an Encompass umbrella policy.  Daniel's father said he appreciated the additional coverage and was pleased that it would protect him, among other things, against an uninsured or underinsured driver.  Mr. Lobosco corrected this assumption and explained the umbrella policy did not provide excess UM or UIM coverage.  Daniel's father was upset and expressed his disbelief that an umbrella policy would not fully protect his family, but he

11

purchased the Encompass Policy and renewed it yearly through the date of his son's accident.

According to Daniel's father, after he purchased the policy from Mr. Lobosco, Mr. Lobosco never discussed the availability of excess UM or UIM coverage. Having expressed his desire for such coverage, Daniel's father expected that Mr. Lobosco would advise him of its availability as soon as it became available. Had Mr. Lobosco done so, Daniel's father "absolutely" would have bought it.

Daniel also presented the testimony of a licensed insurance broker, Frank Seigel, who had worked in the industry for forty-five years and currently did expert consulting, continuing education, and insurance consulting. The court found Seigel qualified as an expert "in the field of property and casualty insurance, and the responsibility of insurance producers, agents and brokers." Seigel testified that though the Encompass Policy did not provide excess UM or UIM coverage, such coverage was readily available in December 2011, before Daniel's accident, when the Yablonskys' Encompass Policy came up for renewal. Such excess UIM coverage, if purchased when the Encompass Policy renewed in December 2011, would have been available to Daniel following his accident. Specifically, when asked, "was there available in 2011 or in 2012 when young

Dan had his accident, was there available the type of coverage that [Daniel's father] had asked [Mr. Lobosco] about when he first bought his umbrella," Seigel said there was, and it was easily accessible.

Seigel explained that he belonged to an organization known as the "Big I," the Independent Insurance Agents and Brokers Association, a "countrywide organization." The Big I provided its member insurance agents and brokers continuing education, member services, and products the member agents and brokers could sell to the public. The Lobosco Agency was a member of the Big I.

According to Seigel, an umbrella policy with excess UM and UIM coverage up to $1,000,000 was available in 2011—when the Yablonskys renewed their Encompass Policy before Daniel's accident—from a company named RLI. The umbrella policy was a product available to independent insurance agents through "Big I," which administered the program. Seigel confirmed with the Big I the umbrella policy was available in 2011. In addition, Seigel testified the Lobosco defendants' expert had noted in his report that the RLI Umbrella had its filing approved in New Jersey in the spring of 2011.

Seigel testified that because the Lobosco defendants had been members of the Big I for years, Mr. Lobosco would have had access to Big I advertising and

13

emails regarding the availability of excess UM and UIM coverage. The coverage was easily accessible through the Big I. A member needed only to "call[] up the Big I, get[] an on-line access code, go[] on line to [a company called] RLI, and get[] all the information that you needed from them."

Seigel explained that an insurance agent could send an application directly to RLI, and if "all the boxes are checked off the way they should be, it just goes - - the policy is issued just like that." If something about an application is questionable, an agent would call the administrator—not the insurance company—who would "get the answer" as to whether the policy would be issued.

Based on the materials he received from the Big I and reviewed, Seigel explained certain features of the RLI UIM umbrella policy. One million dollars of UIM umbrella coverage was available. The policy was a "stand-alone product," that is, it could be purchased as a product separate from an automobile policy. Seigel reviewed 2014 and 2015 underwriting guidelines. Comparing the 2014 and 2015 documents, he confirmed the underwriting guidelines had remained consistent. He explained that in a state like New Jersey coverage is unlikely to become broader over the years; rather, if anything, coverage narrows. Considering the "liberal" RLI underwriting guidelines, the Yablonsky "risk,"

14

and the absence of disqualifying factors in the Yablonsky family, Seigel concluded the Yablonsky account was a "standard" account that would have qualified for coverage under the RLI program.

Seigel at times gave seemingly conflicting testimony about the terms of the RLI UIM coverage. Asked about the difference between an excess policy and an umbrella policy, Seigel explained that an excess policy is typically a "following form" policy, that is, "it's tailored to meet the same terms and conditions as the underlying policy, the policy for which it stands over, and it drops down for the limits, but it doesn't change terms and conditions." In other words, the excess policy will have the same terms and conditions as the underlying policy. In contrast, "[a]n umbrella policy[] not only provides the excess limits, but it also provides broader terms and conditions than the primary policies." The confusion in Seigel's testimony was caused by his and the attorneys' use of the terms "excess" and "umbrella" without regard to Seigel's explanation, and at times as if the terms were interchangeable.

When asked if he knew if "RLI's umbrella policies at any point in time provided umbrella UM/UIM coverage[,]" Seigel responded, "it has its own policy language." When asked what he meant by that, Seigel explained that "[i]nstead of saying in its policy form that if you have uninsured/underinsured

A-2938-17T3

motorists, our policy provides the same terms and conditions as what you have in the primary[,] [i]t attaches a form that says excess uninsured/underinsured motorists, and has its own policy language attached to it." However, when asked, "[a]nd in your report you did not provide an opinion about what that umbrella policy language would cover or would not cover, did you[,]" Seigel responded, "[w]ell, I actually did by saying that the coverage was available. My opinion was that the coverage was available. It was excess uninsured/underinsured motorist coverage in the RLI policy."

As to the duty the Lobosco defendants owed Daniel's father, Seigel testified that in view of the duration of their relationship and Daniel's father following Mr. Lobosco's advice without question—for example, applications for insurance were signed and processed by the Lobosco Group without Daniel's father seeing them—Mr. Lobosco owed Daniel's father a higher standard of care. The standard of care expected of an insurance broker required that Mr. Lobosco be aware of products in the marketplace available to meet his clients' needs. In Seigel's opinion, Mr. Lobosco's failure to offer "the product," namely, excess UM and UIM insurance, to Daniel's father in 2011, violated the standard of care.

The trial court found Daniel's proofs insufficient to survive the Lobosco defendants' motion for an involuntary dismissal. The court determined the

A-2938-17T3

evidence presented a jury issue as to whether a special relationship existed between Daniel's father and Mr. Lobosco that created a heightened duty of care. The court also deemed Daniel's evidence sufficient to create a jury question as to the availability of excess UIM coverage when the Encompass Policy renewed in December 2011. The court granted the motion, however, because Daniel had not produced evidence of the underwriting guidelines that existed in 2011. Daniel had produced no evidence as to whether his family would have met such guidelines, what the terms of a 2011 excess UM/UIM RLI policy would have been, and whether Daniel's claim would have been covered under such a policy.

The trial court dismissed Daniel's claim against the Lobosco defendants and denied his motion for reconsideration.

D. Disposition of the Lobosco Defendants' Indemnification Claim.

Following the trial, the Lobosco defendants renewed their summary judgment motion seeking indemnification against Encompass. Under the terms of the agency agreement between the Lobosco Group and Encompass, Encompass agreed to indemnify the Lobosco Group under certain circumstances. This is the relevant part of the indemnification provision:

> We will Indemnify and hold you harmless from and against all claims, losses, damages, liabilities, judgments or settlements, including reasonable costs, expenses and attorneys' fees . . . arising out of the

A-2938-17T3

relationship of the parties under the terms of this Agreement . . . caused by our act, error or omission, except to the extent that you have caused, contributed to or compounded such act, error or omission.

Finding the indemnification provision unambiguous, the trial court granted Encompass's cross-motion for summary judgment and dismissed the Lobosco defendants' indemnification claim. The court determined the Lobosco defendants' claim for indemnification arose not out of the relationship between them and Encompass but rather out of Mr. Lobosco's relationship with Daniel's father and Mr. Lobosco's alleged negligence in failing to advise him of the availability of additional UIM coverage. The court determined that such professional liability was not a liability that fell within the scope of the agency agreement's indemnification provision.

III.

We first consider Daniel's appeal of the summary judgment dismissal of his claims against Encompass.

A.

Daniel asserts the Encompass Policy's Coverage Summary created a reasonable expectation that excess UIM coverage was included in the umbrella coverage and such an expectation was contradicted by the umbrella endorsement, which excluded UM and UIM coverage. Daniel argues that

18

contrary to the trial court's conclusion, the insured's reasonable expectation of UIM umbrella coverage, created by the ambiguity in the Coverage Summary, could not be remedied by the plain exclusion of UIM umbrella coverage in the umbrella endorsement. Daniel emphasizes that Encompass's post-accident amendment in 2014 to the Coverage Summary—clearly and expressly excluding UM and UIM coverage—demonstrates the pre-2014 ambiguity. Daniel also argues the court erred by considering his father's subjective knowledge, rather than interpreting the policy objectively.

Encompass argues the Coverage Summary contains no ambiguity. Rather, Daniel overlooks the Encompass policy's plain language and the purpose of Umbrella coverage, which is to provide excess liability insurance, not first-party UM or UIM coverage. Encompass emphasizes that the umbrella endorsement is plain and unambiguous, a proposition Daniel cannot reasonably dispute. Encompass also emphasizes that the named insureds had no reasonable expectation of umbrella UIM coverage, as Mr. Lobosco specifically advised Daniel's father that the umbrella endorsement did not include UM and UIM excess coverage. Encompass argues that the 2014 amendment to the Coverage Summary is irrelevant and inadmissible.

A-2938-17T3

B.

Appellate courts "review[] an order granting summary judgment in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (citations omitted). Our function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); accord R. 4:46-2(c). A trial court's determination that a party is entitled to summary judgment as a matter of law is not entitled to any "special deference," and is subject to de novo review. Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016) (citation omitted).

Basic legal principles guide courts construing language in insurance policies. "The doctrine that courts do not lightly interfere with freedom of contract must be applied cautiously and realistically with regard to complex contracts of insurance, since such contracts are highly technical, extremely difficult to understand, and not subject to bargaining over the terms." Sparks v. St. Paul Ins. Co., 100 N.J. 325, 335 (1985). Insurance policies "are contracts of adhesion, prepared unilaterally by the insurer, and have always been subjected

to careful judicial scrutiny to avoid injury to the public." Ibid. (citing Di Orio v. N.J. Mfrs. Ins. Co., 79 N.J. 257, 269 (1979)).

"The fundamental principle of insurance law is to fulfill the objectively reasonable expectations of the parties." Werner Indus., Inc. v. First State Ins. Co., 112 N.J. 30, 35 (1988). Generally, when interpreting an insurance policy, we give its words their plain, ordinary meaning. Kimber Petroleum Corp. v. Travelers Indem. Co., 298 N.J. Super. 286, 300 (App. Div. 1997). Courts should not "engage in a strained construction to support the imposition of liability." Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 273 (2001) (citation omitted).

If a policy's language is clear, the policy should be enforced as written to fulfill the reasonable expectations of the parties. Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 608 (2011). Courts must "'avoid writing a better insurance policy than the one purchased.'" Villa v. Short, 195 N.J. 15, 23 (2008) (quoting President v. Jenkins, 180 N.J. 550, 562 (2004)).

On the other hand, if a policy's terms are ambiguous "they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations." Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010) (citing Doto v. Russo, 140 N.J. 544, 556 (1995)).

21

Here, the parties' dispute as to whether ambiguities exist in the Encompass Policy's Coverage Summary concerning umbrella coverage appears to turn on terms of art undefined in the policy. The Coverage Summary states umbrella coverage "applies to all 'covered exposures' and 'additional covered exposures.'" Encompass claims the language is clear because the purpose of umbrella coverage is to provide excess liability insurance, not first party UM or UIM coverage. Thus, according to Encompass, there is no ambiguity in the Coverage Summary. Moreover, the umbrella endorsement plainly and clearly excludes UM and UIM coverage.

It is questionable whether an unsophisticated insured would understand industry terminology undefined in an insuring agreement. Nevertheless, we conclude the trial court's decision was correct. Daniel's mother and father were the policyholders. They had no expectation of umbrella UIM coverage. Mr. Lobosco had specifically informed Daniel's father the policy did not include umbrella UIM coverage. Daniel's father never forgot that disclosure, nor did he ever entertain any contrary belief. To the contrary, his knowledge that the policy contained no umbrella UM or UIM coverage, and his expressed desire to obtain such coverage if available, were critical elements of Daniel's claim against the Lobosco defendants. Under such circumstances, we will not "engage in a

22

strained construction to support the imposition of liability." Progressive Cas. Ins. Co., 166 N.J. at 273.

Daniel has cited no New Jersey case, or any case for that matter, in which a court has declared that an insurance policy includes coverage the parties to the insurance contract know does not exist. We decline to do so. Daniel's parents, who purchased the Encompass Policy, had no belief that the policy provided UIM umbrella coverage, let alone an objectively reasonable belief. They knew the Encompass Policy provided no such coverage. We decline to write a better insurance policy than the one Daniel's parents knew they purchased. See Villa, 195 N.J. at 23.

IV.

Next, Daniel argues that the trial court erred by failing to apply the correct burden of proof when it granted the Lobosco defendants' motion for an involuntary dismissal at the close of Daniel's proofs. Daniel asserts the burden of proof did not require him to establish both the terms and conditions of the insurance policy Lobosco should have procured and the underwriting guidelines in effect for such policies. Daniel adds the trial court did not give him the benefit of all reasonable inferences as required by the applicable standard of review.

A-2938-17T3

The Lobosco defendants respond that Daniel invited the trial court to require prima facie evidence of causation and is thus barred from taking a different position on appeal. In addition, the Lobosco defendants argue the court correctly followed well-settled causation principles in determining that Daniel failed to establish a prima facie case of professional negligence, as Daniel offered no admissible evidence of the terms of the 2011 coverage or the underwriting guidelines that applied to it.

Daniel replies that the doctrine of invited error is inadmissible and reiterates that the trial court misapplied the burden of proof.

The Supreme Court has explained the duty owed by an insurance broker to a member of the public.

> When engaged by a member of the public to obtain insurance, the law holds [an insurance broker] to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principle seeks to be protected.
>
> [Rider v. Lynch, 42 N.J. 465, 476 (1964).]

If the broker "neglects to procure the insurance, or if the policy is void or materially deficient, or does not provide the coverage [the broker] undertook to supply, because of his failure to exercise the requisite skill of diligence, he

A-2938-17T3

becomes liable to his principal for the loss sustained thereby." Sobotor v. Prudential Prop. & Cas. Ins. Co., 200 N.J. Super. 333, 338 (App. Div. 1984). A duty of an insurance broker is no different than the duty owed by an insurance agent. "The difference between a broker and an agent lies in the duties and responsibilities owed to the insurance carrier, not to the insured." Id. at 337 n.1. Significantly,

> [i]t is not necessary for the client in order to establish a breach of duty to prove that he laid out for the broker the elements of a contract of insurance. It is sufficient to show that he authorized procurement of the insurance needed to cover the risks indicated and that the broker agreed to do so but failed or neglected to perform his duty. The terms of the contract to procure the insurance, the scope of the risk and subject matter to be covered, may be found by implication. The principal does not sue on the contract of insurance; he seeks recovery for the loss occasioned by the failure to procure such a contract or such a valid contract.
>
> [Lynch, 42 N.J. at 477.]

The trial court determined Daniel's proofs were sufficient to show that RLI coverage was available when the Encompass policy renewed in 2011, and that the Lobosco defendants had a special relationship with Daniel's father, which they breached. The court further determined, however, that Daniel had failed to establish the terms of the policy and the underwriting criteria. We agree with Daniel that the court erred in doing so.

25

"A motion for involuntary dismissal only should be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Dutton v. Rando, 458 N.J. Super. 213, 230 (App. Div. 2019) (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)). Thus, when deciding a Rule 4:37-2(b) motion for involuntary dismissal at the end of the plaintiff's case, a court must decide "whether 'the evidence, together with the legitimate inferences therefrom, could sustain a judgment in . . . favor' of the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5 (1969) (quoting Rule 4:37-2(b)). "[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied." Ibid. (citing Bozza v. Vornado, Inc., 42 N.J. 355 (1964)). We apply the same standard as the motion judge. Dutton, 458 N.J. Super. at 230.

Daniel's expert, Seigel, testified about the RLI underwriting guidelines for 2014 and 2016, and testified based on his broad experience in the insurance industry that the 2011 guidelines would have been at least as broad, not narrower. This testimony was not stricken as a net opinion. Evaluating the

testimony under the standard that governs a motion for a voluntary dismissal, a reasonable juror could have readily inferred the underwriting guidelines for the RLI policy would have not excluded Daniel's parents or their family members. Seigel testified expressly that such disqualifiers as youthful operators or operators with previous DWI charges did not exist. Seigel added that as the Yablonskys presented no more than standard risks, they would have fit within the RLI program.

In addition, Seigel testified that an excess policy, as distinguished from an umbrella policy, generally tracked the terms of the underlying coverage. Although his testimony on this point was at times ambiguous, he testified expressly that in his opinion the coverage was available: "it was excess uninsured/underinsured motorist coverage in the RLI policy."

Seigel's testimony supported a reasonable inference that the RLI policy would have provided the Yablonskys with $1,000,000 in excess umbrella coverage. Daniel had no burden to disprove policy exclusions. Generally, a defendant asserting an insurance policy's exclusion has the burden of proving it.

In view of the Supreme Court's holding in Lynch concerning a broker's duty and proof of breach of that duty, 42 N.J. at 477, Seigel's testimony, and our standard of review, we conclude Daniel's proofs should have survived the

Lobosco defendants' involuntary dismissal motion. Daniel having established through Seigel that excess UM coverage was available to the Yablonskys, it was incumbent upon the Lobosco defendants to prove RLI underwriting guidelines or policy exclusions would have precluded coverage.

The Lobosco defendants emphasize general principles of proximate causation and strenuously argue that without proving the terms and conditions of a policy, neither Daniel nor any similarly situated plaintiff can sustain the burden of proving causation. We reject that argument for two reasons. First, considering Daniel's expert's testimony, Daniel submitted proofs that, when viewed under the liberal standard governing involuntary dismissal motions, established a factual dispute for the jury to resolve. Second, as the Supreme Court made clear in Lynch, the insured does not sue on a contract of insurance; rather, the insured seeks recovery for the loss occasioned by the failure to procure such a contract. Ibid. Seigel's testimony established that a $1,000,000 excess UIM policy was available to the Yablonsky family and the Lobosco defendants breached their duty by failing to procure it. Under the standard applicable to a motion for an involuntary dismissal at trial, Daniel's claim should have survived the motion.

A-2938-17T3

We have considered the Lobosco defendants' remaining arguments and found them to be without sufficient merit to warrant further discussion.  R. 2:11-3(e)(1)(E).  Accordingly, we reverse the order involuntarily dismissing Daniel's case and remand the case for retrial.

V.

Last, we address the order that granted summary judgment to Encompass and dismissed the Lobosco complaint for contractual indemnification.  Our review of the trial court's grant of summary judgment to Encompass is de novo, Cypress Point Condo. Ass'n, 226 N.J. at 415, as is our interpretation of the agency agreement, Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011).

The indemnification agreement requires, as a prerequisite, that any "claims, losses, damages, liabilities, judgments or settlements, including reasonable costs, expenses and attorneys' fees . . . aris[e] out of the relationship of the parties under the terms of this Agreement."  Daniel's claim against the Lobosco defendants did not arise out of the Encompass-Lobosco Group agency agreement.  Rather, they arose out of a separate and independent duty Mr. Lobosco owed to Daniel's father, and concerned Mr. Lobosco's failure to inform Daniel's father of an insurance product provided not by Encompass, but by RLI

through the Big I, as evidenced by the first complaint Daniel filed, which did not include Encompass.

The agency agreement's indemnification provision also required that the claim against the Lobosco Group be caused by an act or omission of Encompass, and not by any conduct of the Lobosco Group that caused, contributed to or compounded such act, error or omission. Here it was not an act or omission by Encompass, but an omission by Mr. Lobosco that gave rise to Daniel's claim against the Lobosco defendants. The clear and unambiguous terms of the indemnification provision thus preclude the Lobosco defendants' indemnification claim. See Kieffer, 205 N.J. at 223 ("If an indemnity provision is unambiguous, then the words presumably will reflect the parties' expectations."). Accordingly, we affirm the trial court's order that granted summary judgment to Encompass and dismissed the Lobosco defendants' indemnification claim against Encompass.

Affirmed in part, reversed in part, and remanded for retrial of plaintiff's claim against the Lobosco defendants. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2938-17T3